**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM KLIMEK,<br><br>     Plaintiff,<br><br> v.<br><br>SUNOCO PARTNERS LLC, ROBERT GRAY, UNITED STEELWORKERS LOCAL 397, JOHN DOES (1-10) and ABC CORPS. (1-10) (fictitious names),<br><br>     Defendants. | Civil Action No.: <u>11-cv-01988</u> (CCC)<br><br><br>**OPINION** |

**CECCHI, District Judge.**

## I. **INTRODUCTION**

This matter comes before the Court upon the Motion of Defendant United Steelworkers Local 397 ("Local 397") for Summary Judgment [ECF No. 46] and the Motion of Defendants Robert Gray ("Gray") and Sunoco Partners LLC ("Sunoco") for Summary Judgment [ECF No. 60] (together, "Defendants") against Plaintiff William Klimek ("Plaintiff" or "Klimek"). Also pending before the Court is Defendants' Motion to Strike Plaintiff's Errata Sheet and Expert Report [ECF No. 59]. The Court has carefully considered the submissions made in support of and in opposition to the instant motions. No oral argument was heard pursuant to Fed. R. Civ. P. 78. Based on the reasons that follow, Defendants' Motions for Summary Judgment are granted, and Defendants' Motion to Strike is denied as moot.

## II.   **BACKGROUND**[1]

This action arises out of the termination of Plaintiff on August 23, 2010 due to his alleged violation of the Sunoco Rules of Conduct as the result of two incidents of verbal disputes on Sunoco premises, and out of the subsequent filing and processing of Plaintiff's grievance for wrongful termination by Local 397. Between November 28, 2005 and August 23, 2010, Plaintiff worked as a terminal operator for Sunoco, where he was responsible for the off-loading and loading of oil and gas products. Before beginning his work for Sunoco, Plaintiff was diagnosed with gout, a condition that intermittently causes pain and swelling in a person's joints. In June 2008, Plaintiff suffered a severe gout attack that required him to take a medical leave from work for three months.

The first incident of a verbal dispute involving Plaintiff occurred on January 4, 2009. Around 6:00 p.m., Plaintiff's shift ended and fellow terminal operator Jaroslaw Kwasnik's ("Kwasnik") shift began. Prior to leaving for the night, Plaintiff informed Kwasnik that the main entrance gate to the terminal was malfunctioning. As Plaintiff and Kwasnik tried to fix the gate, Kwasnik began pushing buttons. Plaintiff testified at his deposition that he told Kwasnik, "Don't f**king push them f**king buttons, I don't want to lose my fingers," and that he soon after told Kwasnik, "I can't fix the mother f**king gate." (Klimek Dep., Ex. A to Kindig Cert., at 111:5-20.) Kwasnik subsequently contacted Al Gomez ("Gomez"), Terminal Manager for Sunoco Logistics' Piscataway Terminal, to complain about the incident, and Gomez reported the complaint to Plaintiff's direct supervisor Romeet Ahuja ("Ahuja"). On January 9, 2009, Ahuja and Gomez met first with Kwasnik and then separately with Klimek to discuss the incident. Although there is

---

[1] "On a motion for summary judgment, a district court must view the facts in the light most favorable to the non-moving party, and must make all reasonable inferences in that party's favor." Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).

a dispute between the parties as to whether Gomez and Ahuja provided an official "warning" to Plaintiff, Plaintiff admits that Gomez and Ahuja told Plaintiff that his behavior was unacceptable. (Klimek Dep., Ex. A to Kindig Cert., at 117:19-21.)  Ahuja also drafted a memo after the meeting to document the incident, which states that Klimek "was told that this would serve as his first and last warning."  (Jan. 9, 2009 Memo, Ex. H to Kindig Cert.)  Plaintiff denies having been told at the meeting with Gomez and Ahuja that this was his first and last warning.

The second verbal dispute involving Plaintiff occurred on April 10, 2010.  Plaintiff was working in the Sunoco terminal operator office when Jose Ramos ("Ramos"), a driver for a subcontractor of Sunoco called Island Transportation, entered the office to pick up coffee and noticed that the lights above the coffee machine were out.  Plaintiff testified that, after Ramos made a comment about the coffee being burnt, Plaintiff told Ramos "I have no time to make fresh coffee, I've got a really busy day here today."  (Klimek Dep., Ex. A to Kindig Cert., at 237:3-6.) Ramos testified that after asking Plaintiff why the lights were out, Plaintiff said to him "in a snappy, rude way" that "Island Transportation don't pay the electricity over here.  You don't have to worry about the light."  (Ramos Dep., Ex. L to Kindig Cert., at 15:18-23.)  Ramos further testified that after Ramos commented about the light Plaintiff "just snapped like that," that he "yelled" at him to get out of the office, and that Plaintiff told Ramos that he "didn't belong there." (Id. at 16:1-2; 17:1-2.)

A few days later, Ramos reported the incident to Sunoco Northeast Regional Manager Robert Gray ("Gray"), who investigated Ramos's complaint.  Gray interviewed Ramos about his version of events, and also instructed Ahuja to interview another Island Transportation driver, Dave Machet ("Machet"), who had witnessed the incident.  On April 23, 2010, Ahuja and Gray met with Klimek to discuss Ramos's allegations, and Greg Turner ("Turner"), another Newark

terminal employee, joined the meeting in his capacity as Shop Steward for Local 397.  Gray informed Plaintiff that Ramos had filed a complaint against him for verbal abuse.  Plaintiff recounted his version of the events to Gray and Ahuja.  One distinction between Plaintiff's and Ramos's versions of events related to whether Plaintiff screamed at Ramos or merely spoke to him in a loud manner.  Turner testified that at the end of the meeting, he asked Gray whether there would be an oral or written warning in an attempt to procure for Plaintiff what he believed to be the lesser oral warning.  (Turner Dep., Ex. J to Kindig Cert., at 65:18-66:18.)  Gray testified that he told Turner that there was an ongoing investigation and that Sunoco would get back to them. (Gray Dep., Ex. I to Kindig Cert., at 85:15-25.)  However, Plaintiff claims that, at the end of the meeting, he understood the matter to be concluded and that no discipline would issue.  (Pl's Answers to Interrogatories, Ex. X to Kindig Cert., #1.)

Gray testified that, after the April 23, 2010 meeting, he met with Ramos to discuss the Ramos/Klimek incident again; however, Ramos did not recall a second meeting when asked about it at his deposition.  On May 3, 2010, Gray contacted Human Resources Manager Michelle Achenbach ("Achenbach") by email regarding Ramos's complaint and the investigation.  Around May 10, 2010, Gray spoke to Achenbach via telephone and Gray recommended that Plaintiff be terminated for violating Sunoco policies.  It is unclear whether Ahuja also participated in the phone call.  On May 13, 2010, Gray's supervisor, John McFadden ("McFadden") sent an email to his superior within the company, David Chalson ("Chalson").  The email sought authority to terminate Plaintiff on the basis that Plaintiff had engaged in two incidents of harassing and threatening behavior, and noted that Human Resources supports the recommendation for termination.  On May 14, 2010, McFadden received approval for the termination.

Gray testified that he and Achenbach intended to inform Klimek that he was terminated on

4

his next scheduled shift.  However, on the same date that McFadden received approval for the termination, May 14, 2010, Plaintiff contacted Ahuja to inform him that he had a severe gout attack.  There is some dispute between the parties as to the events that occurred over the next few days.  Ahuja and Gray testified that Plaintiff merely informed Ahuja that he would be out "sick," that Plaintiff was cleared to return to work by his doctor after three or four days out, and that Plaintiff informed Ahuja that he would be returning to work on May 21, 2010.  Gray and Ahuja also testified that, in anticipation, Gray instructed Ahuja to arrange a meeting with Turner to discuss the results of the investigation on Plaintiff's return, which Ahuja did.  A few hours after Ahuja had allegedly contacted Turner, Plaintiff called Ahuja to inform him that he would not be returning to work on Friday due to his gout, and thus the meeting did not occur as planned.  Plaintiff, however, did not testify to first telling Ahuja that he would return on May 21, 2010 before calling a second time to tell Ahuja that he would be taking a longer leave, and notes that he informed Ahuja that he had a severe gout attack when he first took leave on May 14, 2010.  It is undisputed that after May 14, 2010, Plaintiff took a medical leave of absence pursuant to the Family Medical Leave Act ("FMLA"), and Sunoco continued to pay Plaintiff pursuant to its disability benefits program during his leave.

After approximately three months on leave, Plaintiff called Ahuja to inform him that he had been cleared by his doctor to return to work, and Ahuja scheduled Plaintiff to come in to work on August 23, 2010.  Upon his arrival at work, and without prior notice, Plaintiff attended a meeting with Ahuja, Gray, and his Local 397 representative Turner.  Human Resources representative Achenbach was also present at the meeting via telephone.  Gray began the meeting by providing all parties with a copy of a two-page letter, which Gray then read aloud.  The letter stated that, "[t]he conduct that [Klimek] presented in the incident on 1/7/09 and in the recent

incident on 4/10/10 is considered to be harassment and is in violation of Sunoco Logistics company policy." (Aug. 23, 2010 Letter, Ex. N to Kindig Cert.)  The letter also noted that Klimek was "previously warned that this type of behavior will not be tolerated in the workplace" and that he was "given a last and final warning on this company policy." Id.  The letter concluded by stating that "[Klimek's] employment with Sunoco Logistics is terminated effective immediately." Id. Specifically, Sunoco claims that it terminated Plaintiff because his verbal dispute with Ramos violated the Sunoco Logistics' Rules of Conduct, including its policies prohibiting Harassment and Threats in the Workplace, and because he had engaged in and been warned for the previous Rules of Conduct violation regarding his verbal dispute with Kwasnik.

After Gray read the letter, Plaintiff requested to speak privately with Turner.  Plaintiff admits that neither his gout nor his leave of absence were discussed during the meeting.  Once the meeting concluded, and before leaving company property, Plaintiff asked Turner to file a grievance challenging his termination (the "Grievance").  Turner agreed to file the Grievance and told Plaintiff that he would be in touch.  Although Plaintiff was not a member of Local 397, he was entitled to have Local 397 file a grievance on his behalf as a Sunoco employee.  As this was to be Turner's first grievance filing as Shop Steward, Turner sought advice from both Local 397 President John Luminoso ("Luminoso") and former Shop Steward Tom Caruso ("Caruso"). Turner first called Luminoso, who told him to file a grievance for wrongful termination.  Turner also spoke to Caruso about the time frame within which to file grievances, after which point Turner timely filed a Step 1 Grievance for "wrongful termination."  Subsequently, Turner and Plaintiff met in person on Wilson Avenue in Newark, and Turner informed Plaintiff that the Grievance had been filed.  Turner provided Plaintiff with a copy of the Step 1 Grievance and a copy of relevant portions of the Collective Bargaining Agreement between Sunoco and Local 397 (the "CBA").

Although Plaintiff asked Turner to "follow through" with the Grievance, he did not suggest any particular avenues for investigation, such as witnesses to interview or additional documents for Turner to review.  (Klimek Dep., Ex. A to Kindig Cert. at 212:20.)

On September 14, 2010, Ahuja and Turner met to discuss the Step 1 Grievance, at which point Ahuja informed Turner that the Step 1 Grievance was denied.  Turner told Ahuja that the union would proceed to Step 2 of the grievance process.  On September 16, 2010, Ahuja returned the Step 1 Grievance to Turner with Sunoco's official denial in writing.  Turner once again called Luminoso to seek advice, and Luminoso advised Turner to appeal the Grievance to Step 2.  Prior to submitting the Step 2 Grievance, Turner attempted to contact Plaintiff in order to obtain his signature on the Step 2 Grievance, relying on a provision of the CBA which states that a Step 2 appeal must be "signed by the aggrieved employee(s)."  (CBA, Ex. F to Kindig Cert.)  Turner asserts that he had difficulty reaching Plaintiff after the Step 1 denial, and the parties do not dispute that Plaintiff's home telephone was, unbeknownst to Turner, out of service for five or six days around this time.  Further, Plaintiff did not have a cell phone or email address at which he could be contacted.

On October 7, 2010, Plaintiff called the Newark terminal and left a message for Turner to return his call.  Turner returned the call and the two men arranged to meet that evening at a Quick Chek convenience store in Rahway, New Jersey.  At this meeting, Turner had Plaintiff sign both the second and third steps of the Grievance form.  The next morning, on October 8, 2010, Turner submitted the Step 2 Grievance to Achenbach via fax.  Although Turner claims that he believed he was submitting the Grievance in a timely manner, the Grievance was in fact filed one day late.  Achenbach informed Turner that the Grievance was untimely on October 11, 2010, and provided an official letter denying the Grievance as untimely on October 19, 2010.  Between this time,

Turner called Luminoso to inform him that Sunoco denied the Grievance as untimely. Although Turner told Luminoso that he thought he had timely filed the Grievance, Luminoso testified to having told Turner not to pursue the Grievance any further because Sunoco had determined that it was untimely. Around October 19, 2010, Turner informed Plaintiff that the Step 2 Grievance had been untimely filed and that Local 397 would not be pursuing the Grievance any further. In response, Plaintiff requested President Luminoso's telephone number. Plaintiff subsequently called the union office and left a message for Luminoso, but did not receive a return telephone call.

On April 7, 2011, Plaintiff filed suit against Sunoco and Local 397, alleging a violation of the New Jersey Law Against Discrimination ("LAD") by Sunoco for wrongfully terminating Plaintiff because of his gout, and a claim for aiding and abetting against his supervisor Gray. Plaintiff also brought a hybrid claim under Section 301 of the Labor Management Relations Act (the "LMRA"), alleging a breach of the duty of fair representation against Local 397 and a breach of the CBA against Sunoco. Defendants have moved for summary judgment on all claims.

## III.   **LEGAL STANDARD**

Summary judgment is appropriate if the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" demonstrate that there is no genuine issue as to any material fact, and, construing all facts and inferences in a light most favorable to the non-moving party, "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317 (1986), Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).

The moving party has the initial burden of proving the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. Once the moving party meets this burden, the non-

moving party has the burden of identifying specific facts to show that, to the contrary, there exists a genuine issue of material fact for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In order to meet its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (stating that "[t]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint... with conclusory allegations of an affidavit."); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (stating that "[t]o raise a genuine issue of material fact," the opponent must "exceed the 'mere scintilla' threshold..."). A fact is "material" if a dispute about that fact "might affect the outcome of the suit under governing [substantive] law," and a "genuine" issue exists as to that fact "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." Anderson, 477 U.S. at 248. The Court's role is to determine whether there is a genuine issue for trial, not to weigh the evidence and decide the truth of the matter. Id. at 249.

## IV.   NEW JERSEY LAW AGAINST DISCRIMINATION

### A.   Disability Discrimination Claim Against Sunoco

Plaintiff asserts that Sunoco terminated him because of his disability, thereby unlawfully discriminating against him in violation of the LAD. The LAD provides in relevant part:

It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
a. For an employer, because of . . . disability . . . to discharge, or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .

9

N.J.S.A. 10:5-12(a).  Sunoco contends that it is entitled to summary judgment on the LAD claim

because Plaintiff is unable to point to any evidence that Sunoco terminated him because of his

gout.

Although the LAD was enacted to eradicate discriminatory employment practices, "LAD

acknowledges the rights of employers to manage their businesses as they see fit." Viscik v. Fowler

Equipment Co., 800 A.2d 826, 833 (N.J. 2002).  In evaluating a claim of discrimination under the

LAD, New Jersey courts utilize the same burdens of proof and persuasion as those under the

federal anti-discrimination laws, and employ the familiar three-step burden-shifting framework of

McDonnell Douglas.  Id. at 833; A.D.P. v. ExxonMobil Research & Eng'g Co., 54 A.3d 813, 821-

822 (N.J. Super. Ct. App. Div. 2012); Thurston v. Cherry Hill Triplex, 941 F. Supp. 2d 520, 535

(D.N.J. 2008); Swider v. Ha-Lo Indus., Inc., 134 F. Supp. 2d 607, 621 (D.N.J. 2001).  Thus:

> [T]he plaintiff first 'must carry the initial burden . . . of establishing a prima facie case of [unlawful] discrimination.' . . . If the plaintiff succeeds, the burden of *production* shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.' . . . Once the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion).

Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (quoting McDonnell Douglas Corp. v. Green,

411 U.S. 792, 802 (1973)).

The parties concede, for the purposes of the Summary Judgment Motions only, that

Plaintiff has established a *prima facie* case of discrimination, and that Defendant Sunoco has met

its "relatively light" burden of providing a legitimate, non-discriminatory reason for Plaintiff's

discharge (that Plaintiff was terminated for violating the Sunoco Rules of Conduct, specifically its

Equal Employment Opportunity ("EEO") policies against Harassment and Threats in the

Workplace, when he engaged in two verbal disputes with a coworker and an employee of a third-

party contractor). The only issue before the Court in relation to the LAD claim against Sunoco is therefore whether Plaintiff has produced sufficient evidence from which a reasonable factfinder could conclude that Sunoco's articulated legitimate reason for Plaintiff's discharge was pretextual.

The Court notes that "[t]o prove pretext . . . a plaintiff must do more than simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent." Viscik, 800 A.2d 833. However, given "the difficulty of proving discriminatory intent through direct evidence, which is often unavailable," a plaintiff may prove her case of discrimination through circumstantial evidence. Zive v. Stanley Roberts, Inc., 867 A.2d 1133, 1138 (N.J. 2005). Thus, to defeat summary judgment, Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. Under the first prong:

> [T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

Id. at 765 (internal citations and quotation marks omitted).

In his opposition to the Motions for Summary Judgment, Plaintiff points to several facts (albeit without any citations to the record) that he believes cast sufficient doubt on Sunoco's articulated reason for his discharge. First, Plaintiff notes that Sunoco and Gray had knowledge of Klimek's three month leave of absence for gout in 2008 and of his continued difficulties with gout since that time. Specifically, Plaintiff asserts that Klimek's direct supervisor, Ahuja, and Sunoco's

11

ranking HR representative, Achenbach, were aware of Plaintiff's leave of absence due to gout for three months in 2008, which required that his shifts be covered by other terminal operators and that those employees therefore receive additional overtime pay.

Additionally, Plaintiff points to the fact that, while Gray testified that he only learned about Plaintiff's gout several weeks after Plaintiff took his second leave of absence in 2010 (and after the decision to terminate Plaintiff had already been made), Plaintiff testified that Gray was in fact aware of his condition in mid/late April 2010 (after the Ramos incident but prior to when the decision to terminate him was made). Plaintiff's support for his claim that Gray knew of his gout prior to his leave of absence in May 2010 is the fact that Gray brought his two sons to the terminal in mid/late April and, upon introducing them to Plaintiff, "told his sons to be careful, Billy's right wrist is swollen and blown up, he has the gout." (Klimek Dep., Ex. A to Kindig Cert., at 282:6-283:11.) Plaintiff asserts that it is therefore "disingenuous" for Sunoco/Gray to argue that the decision to terminate Plaintiff was made prior to his second leave for gout because, "even though it may be true that Gray's decision to request termination and Achenbach's agreement thereto was made before Klimek began his second medical leave," Gray, Ahuja, and Ahenbach were aware of his previous leave for gout in 2008 and of the flare up of his symptoms prior to his taking leave in 2010. (Pl's Br. at 52.) Plaintiff concludes that "a reasonable finder of fact could believe that the newly appointed Regional Manager Gray did not wish to be saddled with an employee with a chronic medical disability which had previously resulted in a three month absence." (Pl's Br. at 51-52.)

Even accepting as true Plaintiff's claim that Gray was aware of his gout prior to his leave of absence in May 2010 and viewing all inferences in Plaintiff's favor (as we must do on summary judgment), the mere knowledge of Ahuja, Achenbach, and Gray of Plaintiff's gout prior to his

12

termination is insufficient, in itself, to establish pretext.  See Christopher v. Adam's Mark Hotels,

137 F.3d 1069, 1073 (8th Cir. 1998) (noting in the context of a disability discrimination claim

under the Americans with Disabilities Act that "[m]ere knowledge of a disability cannot be

sufficient to show pretext; otherwise, summary judgment for an employer would be appropriate

only in cases where the employer is completely unaware of the plaintiff's disability").  Plaintiff's

argument amounts to no more than mere speculation.  Indeed, when asked on what facts he bases

his claim of disability discrimination, Plaintiff replied:

> Facts is because over making a fresh pot of coffee, I felt that wasn't a severe offense, and
> in my mind I was out in 2008 with a gout attack and now 2010 I had the gout attack.  I
> think Sunoco was looking at it and Bob Gray that I'm going to have a problem with this
> and I'm going to be out maybe in the future again and it's going to cost them money in
> overtime to cover my shifts.

(Klimek Dep., Ex. A to Kindig Cert., 165:8-17.)  Mere speculation is insufficient to defeat a motion

for summary judgment.  See Fletcher v. Lucent Techs., Inc., 207 Fed. Appx. 135, 140 (3d Cir.

2006) (affirming grant of summary judgment in Title VII gender discrimination suit and noting

that plaintiff's arguments regarding the timing of her employer's rolling layoffs and new voluntary

retirement plan were "unsupported and speculative").

Plaintiff's second argument is "that the unremarkable dispute between Klimek and Ramos

. . . could justify the ultimate penalty of termination simply strains credulity."  (Pl's Br. at 53.)

Plaintiff asserts that "the evidence provided by the participants and the witnesses demonstrate the

event to be a few minutes of loud talking or yelling unaccompanied by any cursing, threats or

intimidation.  Klimek's alleged behavior, even upon acceptance of Ramos' version, cannot justify

the penalty of termination under Sunoco's own Rules of Conduct."  (Pl's Br. at 55.)  Plaintiff

continues on to explain that, at most, his conduct constituted a Rules of Conduct Schedule B(3)

violation for the use of abusive and threatening language, rather than a Schedule A(16) offense for

13

violating the EEO Harassment Policy, which prohibits "Any activity where the conduct has the effect of creating an intimidating, hostile or offensive work environment." (Harassment Policy, Ex. C to Klimek Dep.) Whereas the Rules of Conduct state that first time violations of Schedule A "would subject the employee to disciplinary action up to and including dismissal," Schedule B states:

> B. Violations of any of the following are considered a serious misconduct. The first violation of any of these regulations would result, at minimum, in a written warning. The second violation will subject an employee to suspension without pay for up to three days. Any further violations can result in discharge.

(The Rules of Conduct, Ex. D to Kindig Cert.) Thus, Plaintiff concludes that "A finder of fact could easily conclude Sunoco and Gray's characterization of the Klimek/Ramos light bulb spat as an EEO violation instead of a Rule of Conduct B(3) issue to be implausible or inconsistent." (Pl's Br. at 56.)

This argument, however, is also insufficient to establish pretext. As noted above, it is not the province of the Court to consider whether Sunoco's decision was "wrong or mistaken." Fuentes, 32 F.3d at 765. Further, and importantly, Plaintiff does not dispute the material facts on which Sunoco claims that it based its decision to terminate him. Although Plaintiff asserts that he merely spoke to Ramos "sternly," (Klimek Dep., Ex. A to Kindig Cert., at 140:20-21), whereas Ramos testified that Plaintiff "yell[ed]" at him, (Ramos Dep., Ex. L to Kindig Cert., at 16:11, 17:1), Plaintiff does not provide reason to doubt that Ramos was upset after the incident, nor does he question whether Ramos in fact reported the incident to Plaintiff's supervisors. In addition, apart from whether or not he received an official "warning," Plaintiff does not dispute the underlying facts of the first verbal dispute that he had with Kwasnik, including the fact that he cursed at Kwasnik, that Kwasnik reported the incident, and that Plaintiff was told by his

supervisors that his behavior was unacceptable.  An unpublished Third Circuit opinion, <u>Emmett v.</u>

<u>Kwik Lok Corp.</u> is illustrative in this regard:

> Emmett identifies two factual disputes that, he claims, could cast doubt on Kwik Lok's proffered justifications.  First, he admits that he raised his voice at Crabill, but claims that he was not—as Crabill suggests—"out of control screaming and yelling." . . .  While Emmett may characterize his conversation with Crabill differently than Crabill does, he offers no reason to doubt that Crabill was upset after the conversation or that Crabill reported the incident to Emmett's supervisors.  Indeed, Emmett acknowledges that, after the incident, Zaremba asked him to call Crabill and "kind of smooth things over." . . .  Thus, Emmett provides no reason to doubt that, at the time Miller made the decision to terminate his employment, Miller believed that Emmett had spoken to Crabill in an unprofessional manner.

528 Fed. Appx. 257, 261 (3d Cir. 2013).  Similarly, while Plaintiff may characterize the incident

as an "unremarkable dispute," Plaintiff provides little reason to doubt that Gray and Sunoco relied

on Ramos's version of events—that Plaintiff yelled at Ramos in a disrespectful and upsetting

manner—in reaching their decision to terminate him.  See <u>Fuentes</u>, 32 F.3d at 767-77.

Additionally, even accepting that Plaintiff's conduct could be characterized as at most a

Schedule B(3) violation for abusive and threatening behavior and not a Schedule A violation of

the Harassment Policy, and that the company therefore did not adhere to its policy to provide

progressive discipline rather than immediate termination, this does not provide sufficient evidence

of pretext.  Plaintiff has not "produced evidence that this disciplinary policy was mandatory or

rigorously followed, so little can be inferred from the company's decision not to adhere to the

policy in this instance." <u>Emmett</u>, 528 Fed. Appx. at 262.  In fact, the Rules of Conduct specifically

states that "The Company reserves the right to impose penalties different than those listed herein,

depending upon the nature of the circumstances involved in each individual case."  (Rules of

Conduct, Ex. D to Kindig Cert.)   A mere failure to strictly comply with its non-mandatory

disciplinary policy does not sufficiently support the inference that Sunoco fired Plaintiff because

he had gout such that a reasonable finder of fact could conclude that Sunoco discriminated against him in violation of the LAD.

Third, Plaintiff argues that his termination is inconsistent with Sunoco's treatment of rule violations by other employees. Plaintiff points to four instances of rule violations by other terminal operators at Sunoco's Newark facility where the employees "received little or no discipline for misconduct of a more serious nature than that attributed to Klimek." (Pl's Br. at 56.) The conduct of those other employees constituted a falsified bill of lading, a red dye spill that cost Sunoco $8,000 to clean, two instances of tardiness plus a work performance deficiency, and an alleged fall on the pipelines at the terminal as the result of walking on pipes as opposed to catwalks as required. Plaintiff notes that each of these four employees received little to no discipline even though he characterizes their conduct as constituting Schedule A violations, which would subject them to the possibility of termination.

The alleged disparity between Plaintiff's discipline and the discipline received by these four other employees, however, is irrelevant. It is undisputed that a plaintiff may establish pretext by showing "that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other categories of protected persons." Fuentes, 32 F.3d at 765. The Third Circuit has explained in the context of a claim of unlawful discrimination based on race, gender, and age that:

> While "similarly situated" does not mean identically situated, the plaintiff must nevertheless be similar in all relevant respects. Which factors are relevant is determined by the context of each case, but often includes a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.

Opatsnik v. Norfolk S. Corp., 335 Fed. Appx. 220, 222-23 (3d Cir. 2009) (internal quotations and

16

citations omitted).  As Defendants correctly assert, "Plaintiff offers no evidence regarding whether [the employees he references as receiving more favorable treatment] are or are not members of his protected class (i.e. disabled)." (Sunoco Reply Br. at 6.)  Furthermore, these four other employees did not engage in "similar conduct."  Plaintiff was disciplined for allegedly engaging in harassing and threatening behavior during two verbal disputes, one with a coworker and one with a third-party contractor's employee.  None of the conduct of the other four terminal operators involved any form of aggressive behavior directed at another person on Sunoco grounds.  Thus, as these four employees are not relevant comparators, this evidence is insufficient to enable a factfinder "to reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision." Fuentes, 32 F.3d at 765.[2]

Plaintiff's final attempts to establish evidence of pretext relate to Gray's credibility as to the scope and findings of his investigation.  First, Plaintiff cites to what he characterizes as inconsistent deposition testimony to establish that Gray's investigation was not as extensive as Gray makes out.  Most of these supposed inconsistencies, however, amount to little more than

---

[2] Plaintiff also attempts to introduce evidence that Sunoco discriminated against a member of his protected class because Kwasnik, who had fractured a rib in a fall that allegedly occurred on company premises, initially requested to use sick leave but later sent an email to Ahuja requesting to use vacation days instead.  Plaintiff speculates that Gray instructed Kwasnik to request this change, and thus argues that this "bespeaks a hostility to employee's utilization of sick leave" and "raises an inference that Gray would disfavor an employee such as Klimek who had previously utilized extended sick leave and suffered from a chronic disability." (Pl's Br. at 61.)  There is insufficient evidence, however, that Gray did in fact direct Kwasnik to rescind his request for sick leave and to use vacation time instead, and the deposition testimony Plaintiff references does not support that conclusion.  Furthermore, Plaintiff has not identified Kwasnik as a member of his protected class, as a rib fracture does not necessarily mean that Kwasnik is or was disabled, such that Sunoco's treatment of Kwasnik would evidence "discriminat[ion]" against other members of his protected class." Fuentes, 32 F.3d at 765.

17

word play by Plaintiff.  For example, Plaintiff notes that Gray testified that when he asked Ramos during his investigation whether he felt threatened, Ramos responded "Yes, I felt threatened." (Gray Dep., Ex. I to Kindig Cert., at 71:23-24.)  However, when Ramos was asked in his deposition whether he told Gray that he felt threatened, Ramos responded, "Threatened?  I don't remember. But I did – I did feel uncomfortable, the way he approached me, though."  (Ramos Dep., Ex. L to Kindig Cert., at 31:14-18.)  While there may be some distinction between feeling "threatened" and feeling "uncomfortable," Ramos testified that he merely did not remember whether he told Gray that he felt threatened, and certainly testified that he at the very least felt uncomfortable and upset by Plaintiff's actions.  As another example, Plaintiff argues that Gray "misrepresented the results of Ahuja's interview of a purported witness to the incident, Island Transportation truck driver David Machet" (Pl's Br. at 63) because, while Gray testified that Ahuja reported that Machet provided a "consistent" version of events to Ramos, Gray didn't mention that Ahuja also told him that Machet advised that "Bill had spoken to [Ramos] in a loud manner."  (Ahuja Dep., Ex. G to Kindig Cert., at 92:23-24.)  Plaintiff argues that this is crucial because Ramos reported that Plaintiff yelled at him whereas Plaintiff only reported speaking in a loud manner.  However, Plaintiff ignores that Ahuja himself testified that "I just did call Bob [Gray] up and tell him I did speak to Mr. Machet, and he concurred with what Jose was saying . . ."  (Ahuja Dep, Ex. G to Kindig Cert, at 93:7-9.)  It is questionable whether the above can even be characterized as inconsistencies.

The remainder of Plaintiff's points in relation to Gray's deposition testimony amount to little more than immaterial facts about the investigation into Plaintiff's conduct.  Plaintiff points out that while Gray recounted having conducted follow up interviews with Ramos, Klimek, and Ahuja, these three individuals did not recall follow up meetings with Gray in their depositions. These alleged inconsistencies in witness testimony seem to stem from a less than complete

recollection of events that occurred over two years prior. See Bentley v. Millenium Healthcare Ctrs. II, LLC, Civ. No. 06-5939, 2009 WL 211653, at *8 (D.N.J. Jan. 21, 2009) (finding inconsistent deposition testimony of witnesses in age discrimination case insufficient to establish pretext because "[w]hile many of [the] witnesses seem to be confused about the events surrounding the termination . . . the inconsistencies and confusion within the testimony . . . seem to stem only from their inability to recall events that occurred over four years ago"); Hodczak v. Latrobe Specialty Steel Co., 761 F. Supp. 2d 261, 277 (W.D. Pa. 2010) (granting summary judgment to employer in age discrimination case in which immaterial inconsistencies in deposition testimony did not amount to sufficient evidence of pretext). Furthermore, even assuming that Gray did not conduct follow up interviews, it is not the province of the Court to consider whether Gray should have conducted a more thorough investigation. Bentley, 2009 WL 211653, at *9 (noting that "even if [the employer's] entire investigation was inadequate, that fact alone would not be sufficient evidence to raise an inference of pretext"). Thus, Plaintiff has at most cast doubt on the extent of the investigation, which is insufficient to establish pretext; he has not provided any reason to doubt the reason behind Sunoco's decision to terminate Plaintiff or to raise an inference that the decision was motivated by Plaintiff's gout.

Finally, Plaintiff argues that "Gray's May 3, 2010 email to Achenbach, McFadden and Ahuja providing the results of his investigation is rife with misinformation and outright falsities." (Pl's Br. at 66.) However, Plaintiff offers no evidence, apart from his previous arguments regarding the allegedly inconsistent witness testimony and his own denial of the events, that this email does in fact contain inconsistencies. In short, Plaintiff has failed to offer sufficient evidence from which a reasonable factfinder could conclude that Sunoco's proffered legitimate reasons for terminating him are pretextual. The Court finds that there are no material facts in dispute and will

19

therefore grant summary judgment to Sunoco on Plaintiff's LAD claim.

**B.    Aiding and Abetting Claim Against Gray**

Plaintiff asserts that Gray is responsible for "aiding and abetting" Sunoco's discrimination of Plaintiff on the basis of his disability.  In order to establish an aiding and abetting claim under the LAD, a plaintiff must show that 1) the party whom the defendant aided performed a wrongful act that caused an injury, 2) the defendant was "generally aware of his role as part of an overall illegal or tortuous activity at the time that he provide[d] the assistance", and 3) the defendant knowingly and substantially assisted the principal violation.  Photis v. Sears Holding Corp., Civ. Action No. 11-cv-6799, 2013 WL 3872519, at *10 (D.N.J. July 25, 2013) (internal quotations and citations omitted).  An individual may only be held liable under the LAD when the employer may be held liable under the statute.  Id.  Here, the Court has granted summary judgment to Sunoco on the LAD claim.  Thus, the aiding and abetting claim against Gray fails as well.

**V.    HYBRID CLAIM UNDER § 301 OF THE LABOR MANAGEMENT RELATIONS ACT**

Plaintiff brings a "hybrid" claim pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, asserting that 1) Local 397 breached its duty of fair representation and that 2) Sunoco breached the collective bargaining agreement for terminating Plaintiff without just cause.  "A union's breach of the duty of fair representation is a 'necessary condition precedent' to a Section 301 claim against an employer for breach of a collective bargaining agreement."  Roe v. Diamond, 519 Fed. Appx. 752, 757 (3d Cir. 2013) (quoting Albright v. Virtue, 273 F.3d 564, 576 (3d Cir. 2001).  Further, these two claims are "inextricably interdependent," meaning that "[t]o prevail against either the company or the Union, . . . [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a

breach of duty by the Union." DelCostello v. Int'l Bhd. Of Teamsters, 462 U.S. 151, 164-65 (1983); Felice v. Sever, 985 F.2d 1221, 1226 (3d Cir. 1993) ("In the "hybrid" suit, the plaintiff will have to prove that the employer breached the collective bargaining agreement in order to prevail on the breach of duty of fair representation claim against the union, and vice versa.").

### A.    Breach of Duty of Fair Representation

Plaintiff makes two distinct arguments with respect to his claim for a breach of duty of fair representation: 1) that Local 397's handling of his Grievance was arbitrary, and 2) that Local 397's conduct in the processing of his Grievance was discriminatory because it was based on his status as a non-union employee.  In response, Defendants argue that Local 397's conduct in processing Plaintiff's Grievance was at most negligent, which is insufficient to establish a claim for breach of the duty of fair representation.  Further, Defendants argue that Plaintiff has offered no facts to demonstrate any hostility on the part of the union on the basis of Plaintiff's non-union status, and thus that he fails to establish discriminatory conduct on the part of Local 397.

To establish a claim for a union's breach of the duty of fair representation, a plaintiff must produce sufficient facts from which a jury could reasonably conclude that the union's conduct was arbitrary, discriminatory, or in bad faith. Vaca v. Sipes, 386 U.S. 171, 190 (1967).  Again, Plaintiff contends that Local 397's conduct was arbitrary and/or discriminatory.[3]  (See Pl's Br. at 73-91.) Thus, the Court will analyze those two prongs in turn.

---

[3] Although Plaintiff focuses on whether Local 397's conduct was arbitrary or discriminatory, the Court notes that the facts provided by Plaintiff would not support a claim for bad faith conduct either.  A finding of bad faith "requires 'substantial evidence of fraud, deceitful action or dishonest conduct,'" none of which has been presented here. Wilson v. Am. Postal Workers Union, 433 F. Supp. 2d 444, 449 (D. Del. 2006) (quoting Humphrey v. Moore, 375 U.S. 335, 348 (1964)).

"[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65 (1991) (quoting Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953)) (internal citations omitted). A union "has broad discretion in its decision whether and how to pursue an employee's grievance against an employer." Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 567-68 (1990). Furthermore, "proof that the union may have acted negligently or exercised poor judgment is not enough to support a claim of fair representation." Bazarte v. United Transp. Union, 429 F.2d 868, 872 (3d Cir. 1970). Thus, an employee is "subject to the union's discretionary power to settle or even to abandon a grievance, as long as it does not act arbitrarily." Id. at 872.

Plaintiff argues that Local 397, through Turner, arbitrarily and perfunctorily processed his Grievance, both in filing the Step 2 Grievance one day past the filing deadline, and in failing to pursue the Grievance beyond Step 2, allegedly without any investigation or analysis. Plaintiff notes that Turner had 15 business days to contact Plaintiff to obtain his signature and to file the Step 2 Grievance after discovering that it was denied at Step 1. Despite this, Plaintiff argues that Turner did not meet with Plaintiff until the day before the Grievance was due, and did not forward the Grievance to Human Resources until the next morning (making it one day late), when he could have submitted the perfected Grievance the same day that it was signed.

Plaintiff further argues that after the Grievance was denied as untimely at Step 2, Local 397 President Luminoso and Turner failed to take any action on Plaintiff's behalf, despite the fact that Turner informed Luminoso that he disputed Sunoco's determination that the Grievance was untimely. According to Plaintiff's interpretation of the CBA, the CBA would allow an arbitrator to consider whether the Grievance was timely filed. Additionally, Plaintiff notes that Luminoso

testified that he originally instructed Turner to file the Grievance without Plaintiff's signature because of the impending deadline, which allows for the inference that the union "would, in some circumstances, continue to process a procedurally defective grievance and there is simply no explanation distinguishing a late grievance with an unsigned grievance." (Pl's Br. at 86.) Further, when asked in his deposition whether the Step 3 Grievance should have been filed, Luminoso's initial response was that he "didn't have enough information to go on." (Luminoso Dep., Ex. Q to Tykulsker Cert., at 69:16-19.)[4]  Finally, Plaintiff points out that Local 397's decision to stop processing the Grievance allegedly violated its own internal grievance procedures, which require that "A majority consensus of all the shop stewards/committee must be obtained prior to any grievance being withdrawn" and that "Any grievance involving the discharge/termination of employment of any member of any bargaining unit shall have the approval of the local union executive board prior to being withdrawn." (Local 6-397 Policy on Grievances, Ex. M to Nulty Cert.)

In response, Defendants argue that there was a rational explanation related to the CBA for each action that Local 397 took with respect to Plaintiff's Grievance.  First, Turner reasonably determined that Klimek's signature was needed on the grievance form to process it to Step 2 based on the language of the CBA.  Turner attempted to contact Plaintiff multiple times to obtain his signature, but was unable to reach him for several days, in part because Plaintiff's phone was not working.  When Turner finally did manage to speak to Plaintiff, he met with him promptly and

---

[4] It should be noted that Luminoso was immediately thereafter asked "In retrospect, do you think it would have been a good idea to gather the information to determine whether or not step three should have been filed?" and that he responded "There was enough information.  It was not done in a timely manner." (Luminoso Dep., Ex. Q to Tykulsker Cert., at 69:20-25.)

23

had both Step 2 and Step 3 of the grievance forms signed so as to not have to worry about reaching Plaintiff in the event that he had to file Step 3. Defendants assert that Turner's failure to submit the Step 2 Grievance in a timely manner was merely the result of a mistaken calculation and amounts to no more than mere negligence.

Local 397 next argues that it rationally decided not to process the Grievance after Step 2 because the submission was untimely, noting that Luminoso testified to having informed Turner not to move the Grievance to Step 3 because it was untimely. Local 397 argues that "[w]hatever the merits of the Union's decisions that it needed Plaintiff's signature on the grievance form and that the grievance should not be further pursued because of its untimeliness, these decisions were rationally based on the Union's understanding of the CBA." (Local 397's Reply Br. at 5.) Local 397 explains that, because Article V of the CBA states that an arbitrator "shall have authority only to consider grievances which have been properly carried through all the steps of the grievance procedure," (CBA, Ex. F to Kindig Cert.), and because the untimely filing meant that Plaintiff's Grievance was *not* properly carried through the grievance procedure, Gray and Luminoso determined that the Grievance could no longer be pursued. Given the "highly deferential" standard articulated in O'Neill, Local 397 asserts that the Court should not replace Local 397's interpretation of the CBA with its own.

Plaintiff argues that, while the Third Circuit's framework for analyzing arbitrary union actions remains unclear, especially when the union's conduct is of a ministerial or administrative nature, other circuits have established that the failure to perform an administrative act is by itself sufficient to satisfy the arbitrary prong. In Beck v. United Food & Commercial Workers Union, Local 99, the Ninth Circuit drew a distinction between "intentional conduct by a union exercising its judgment" and "actions or omissions that are unintentional, irrational or wholly inexplicable,

such as an irrational failure to perform a ministerial or procedural act." 506 F.3d 874 (9th Cir. 2007). While the former actions receive significant deference and only constitute a breach of the duty of fair representation if exercised discriminatorily or in bad faith, the latter actions are not entitled to such deference and breach the duty of fair representation "where the act substantially injures the union member." Id. At 880. Thus, the Ninth Circuit concluded that "[w]here a union has agreed to file a grievance but fails to file the grievance in a timely fashion, the union's error is properly characterized as a 'failure to perform a ministerial act required to carry out [its] decision.'" Id. at 881 (quoting Dutrisac v. Caterpillar Tractor Co., 749 F.2d 1270, 1273 (9th Cir. 1983)). Similarly, the Sixth Circuit in Vencl v. International Union of Operating Engineers, Local 18 noted that "[a] union acts arbitrarily by failing to take a basic and required step . . . . Timely filing is both basic and required." 137 F.3d 420, 426 (6th Cir. 1998) (citations omitted). The Court went on to hold that, unless there is reasonable justification or excuse, an untimely filing constitutes arbitrary and perfunctory conduct, violating the duty of fair representation. Id.

As Defendants point out, however, the Third Circuit has not drawn such a distinction between procedural and non-procedural acts. In fact, in Ahmad v. United Parcel Service, a case that was decided after both Beck and Vencl, the Third Circuit found a failure to timely file a grievance appeal due to a clerical error insufficient to establish arbitrary conduct on the part of the union. 281 Fed. Appx. 102, 105 (3d Cir. 2008) ("[Plaintiff] argues that the Union breached its duty of fair representation due to [his Union Business Agent's] failure to timely file the Step Three appeal. However, this Court has stated that mere negligence is not enough to support a claim of unfair representation."). See also Wilson, 433 F. Supp. at 449 (holding that "[t]he Union's failure to timely file the grievance can amount to no more than mere negligence, considering the two copies of the Notice of Removal sent to Plaintiff on different dates and the apparent confusion as

to when the time limit for filing began to run" and noting that "negligence alone does not constitute arbitrariness").   Thus, under the law of this Circuit, Turner's untimely filing of the Step 2 Grievance appears insufficient to satisfy the arbitrary prong of the duty of fair representation.

Furthermore, both <u>Beck</u> and <u>Vencl</u> are distinguishable from this case.  In <u>Beck</u>, the district court determined at a bench trial that the union acted both discriminatorily and in bad faith, and that the union acted "without any rational basis" in failing to file an earlier grievance on behalf of the plaintiff.  <u>Beck v. United Food & Commercial Workers Union, Local 99</u>, No. CIV 02-0495-PCT-EHC, 2005 U.S. Dist. LEXIS 45906, at *19-20 (D. Ariz. July 12, 2005).  In <u>Vencl</u>, the court found that the union lacked a "reasonable excuse" for filing its request for arbitration one day late because the only excuse offered by the union for its untimely filing was that its business representative had gone on vacation.  137 F. 3d at 426.  In this case, by contrast, Turner admits that the late filing was the result of a mistaken calculation on his part as to the number of days within which he was able to file the Step 2 Grievance.  It was reasonable for Turner to conclude that he needed Plaintiff's signature prior to submitting the Step 2 Grievance, given that the CBA requires a written grievance to be signed in order to be considered.  Further, Plaintiff does not deny that his phone was out of order for several days such that Turner would have been unable to get in touch with him during that time, or that Turner did not know that Klimek's phone was out of service.   Turner testified that he attempted to contact Plaintiff multiple times prior to the date of the submission of the Grievance on October 8, 2010.  Turner submitted the Grievance the very next morning after meeting Plaintiff.  Thus, his conduct with respect to the untimely filing of the Grievance, although a mistake, constitutes at most negligence.

Furthermore, Plaintiff's arguments with respect to Local 397's decision not to pursue the Grievance past Step 2 also must fail.  An employee does not have "an absolute right to force his

collective bargaining agent to press his complaint all the way to the very end of the grievance procedures . . . ." Bazarte, 429 F.2d at 872.  It is within the power of the union "not to assert or press grievances which it believes in good faith do not warrant such action . . . even if it can later be demonstrated that the employee's claim was meritorious." Id.  Here, Turner and Luminoso did not pursue the Grievance past Step 2 because Sunoco, through Achenbach, had informed them that the Grievance was untimely, and because the CBA states that "the arbitrator shall have authority only to consider grievances which have been properly carried through all the steps of the grievance procedure." (CBA, Ex. F to Kindig Cert.)  The parties do not dispute that the Grievance was in fact untimely.  Even though Turner believed that he had filed the Grievance in a timely manner at the time that it was denied, he testified that he did not believe that he could appeal the Grievance to Step 3 because Achenbach and thus Sunoco had determined that it was untimely.  Luminoso similarly testified that the Grievance was not pursued beyond Step 2 because it was untimely. Although it is unclear whether Local 397 in fact could have pursued the Grievance any further, and although Turner and Luminoso perhaps could have done more to investigate the timeliness issue, their determination at the time of the Step 2 denial that they could not pursue it further was not so "irrational" as to rise to the level of arbitrary conduct, constituting a breach of the duty of fair representation.  As the Third Circuit has noted, "[e]ven a union decision that is ultimately wrong is not a breach of its fair representation duty unless that decision is so unreasonable that it is 'without rational basis or explanation.'" Raczkowski v. Empire Kosher Poultry, 185 Fed. Appx. 117, 118 (3d Cir. 2006) (quoting Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 46 (1998)).[5]

---

[5] Plaintiff's argument regarding Local 397's alleged failure to follow its own internal grievance procedures also must fail.  The provisions of the Local 397 policy to which Plaintiff cites refer to "withdrawal" of a grievance.  Here, Local 397 chose not to further

Thus, while Local 397's representation of Plaintiff was certainly less than exemplary, there is insufficient evidence as a matter of law to find that Local 397's conduct was "arbitrary" under Third Circuit standards.

In addition to his claim of arbitrariness, Plaintiff also asserts that a genuine issue of fact exists as to whether Local 397's conduct in failing to process Plaintiff's Grievance was based on Plaintiff's status as a non-dues-paying employee, thus constituting "discriminatory" conduct in violation of the duty of unfair representation. Unions are under "a statutory obligation to serve the interests of all members without hostility or discrimination toward any." O'Neill, 499 U.S. at 76 (quoting Vaca, 386 U.S. at 177). A union acts in a discriminatory manner when it treats members of a bargaining unit differently "because of an irrelevant and invidious distinction." Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81, 87 (3d. Cir. 1982) (quotations and citations omitted). Non-union membership status has been found to constitute a relevant characteristic on which to base a claim for discrimination in breach of the duty of fair representation. See Thompson v. Bhd. of Sleeping Car Porters, 316 F.2d 191, 199 (4th Cir. 1963); Castell v. Douglas Aircraft Co., 752 F.2d 1480, 1483 (9th Cir. 1985).

In support of his claim of discrimination, Plaintiff first argues that the union employees at the Newark Sunoco terminal were aware of Plaintiff's negative attitude towards union membership. He notes that when terminal operator and former Local 397 Shop Steward Caruso approached Plaintiff to ask whether he would like to join the union, Plaintiff declined, explaining that his father was a long-time union worker who lost his pension because "the union stole the

_____

pursue the Grievance after it was denied at Step 3, rather than to withdraw a pending grievance, and thus its actions do not appear to have violated the Local 397 Policy on Grievances.

money" and that Plaintiff is "really not a union guy." (Klimek Dep., Ex. A to Kindig Cert., at 101:4-102:3.) When asked how Caruso responded to Plaintiff's answer, Plaintiff testified, "Not much. Maybe a face." (Id. at 102:8.) Plaintiff's second point with regard to discrimination is that Turner mentioned the fact that Plaintiff was a "non-union" employee two times throughout the grievance process. First, Luminoso testified that when he advised Turner during a telephone call that a grievance for unjust termination needed to be filed on Plaintiff's behalf, Turner "said the man's a nonunion member, he doesn't pay dues." (Luminoso Dep., Ex. Q to Tykulsker Cert., at 22:10-11.) Second, Plaintiff points out that in the minutes from a September 7, 2010 Local 397 meeting where Plaintiff's Grievance was discussed, there is a reference to Plaintiff as a "nonunion man" next to his name. When Luminoso was asked why the minutes noted that Plaintiff was a nonunion man, Luminoso replied that "[t]hat may have been what Greg Turner said at the time, that a nonunion member was terminated." (Id. at 37:24-38:1.)

The Court finds that no reasonable jury could conclude that Local 397 acted in a discriminatory manner towards Plaintiff in the processing of his Grievance based on the evidence that Plaintiff has adduced. The fact that Caruso was "aware" of Plaintiff's negative attitude towards union membership is irrelevant. First, the conversation regarding union membership between Caruso and Plaintiff took place soon after Plaintiff began his employment with Sunoco, more than four years prior to the processing of Plaintiff's Grievance. Second, Caruso was not the shop steward/Plaintiff's union representative during the processing of the Grievance, and he merely provided peripheral advice to Turner as to how to process the Grievance. Third, Caruso's reply to Plaintiff's comments does not demonstrate hostility, as Plaintiff testified that Caruso's response was "Not Much. Maybe a face." (Klimek Dep., Ex. A to Kindig Cert., 102:8.) Plaintiff also commented that "It wasn't a big conversation." (Id. at 102:14.) With regards to the two

occasions on which Turner mentioned Plaintiff's non-union status, these facts are also insufficient as evidence of discrimination.  Turner's mere mention of the fact that Plaintiff is a non-union member to Luminoso does not demonstrate hostility; Turner was seeking the advice of Luminoso as to how to proceed after Plaintiff's termination and, this being his first time processing a grievance, it is clear that Turner was inquiring as to his responsibilities with respect to non-union members.  Luminoso testified that when Turner mentioned that Plaintiff was a non-union member, it was in order to inquire as to his obligations, and Luminoso informed Turner in response that "we still have to file a grievance." (Luminoso Dep., Ex. Q to Tykulsker Cert., at 22:12.)[6]

The second mention of Plaintiff's non-union status by Turner at the Local 397 meeting does no more to allow for an inference of discrimination.  Plaintiff has provided no evidence that Local 397 treated him any differently because of his non-union status, or that Turner, Luminoso, or the Union expressed any hostility towards him.  In fact, Plaintiff testified that prior to his discharge and the processing of his Grievance, he had no problems with the union.  (Klimek Dep., Ex. A to Kindig Cert., at 234:2-3; 256:22-23.)  Furthermore, Plaintiff testified that when he first spoke to Turner about filing a grievance on his behalf, Turner "shook [his] hand.  He said he takes

_____

[6] Luminoso's further deposition testimony explaining Turner's mentioning of Plaintiff's non-union status belies any inference of hostility:
> Q: When [Turner] told you he was a nonunion member, was he telling you that in the context of, "what are our obligations to him?"
> A: Right.
> Q: He didn't know what the obligations were, and you advised him that regardless of his union membership, 397 was obligated to pursue his grievance for him?
> A: Yes.
> Q: If the grievance was meritorious, correct?
> A: Yes.

(Luminoso Dep., Ex. Q to Tykulsker Cert., at 22:18-23:4.)

care of his men and he'll take care of this." (Id. at 20:23-24.)  Finally, Plaintiff has offered no evidence that Local 397 acted differently in processing union member's grievances.  Thus, the Court finds that, based on the evidence presented, no reasonable jury could find that Local 397 acted in a discriminatory manner in processing Plaintiff's Grievance.  As Plaintiff has failed to produce sufficient evidence to demonstrate that Local 397 acted arbitrarily, discriminatorily, or in bad faith, and as no material facts are in dispute, the Court will grant summary judgment to Local 397 on the duty of fair representation claim.

### B.      Breach of the Collective Bargaining Agreement

Plaintiff alleges that Sunoco violated the CBA by terminating him without just cause.  As previously noted, "[a] union's breach of the duty of fair representation is a 'necessary condition precedent' to a Section 301 claim against an employer for breach of a collective bargaining agreement."  Roe, 519 Fed. Appx. at 757 (quoting Albright, 273 F.3d at 576).  Since the Court has dismissed the breach of duty of fair representation claim against Local 397, the breach of the CBA claim against Sunoco must be dismissed as well.  See United Parcel Serv. Inc. v. Mitchell, 451 U.S. 56, 62 (1981) (noting that "respondent was required in some way to show that the Union's duty to represent him fairly at the arbitration had been breached before he was entitled to reach the merits of his contract claim"); Albright, 273 F.3d at 576.  The Court will therefore grant summary judgment to Defendant Sunoco on the breach of contract claim.

## VI.     MOTION TO STRIKE PLAINTIFF'S ERRATA SHEET AND EXPERT REPORT

Defendants Sunoco and Gray, joined by Local 397, moved to strike portions of Plaintiff's errata sheet and the expert report of Dr. Gerard A. Figurelli of Psychotherapy Associates, Inc. (the "Psychotherapy Associates Report").  In particular, Defendants argue that Plaintiff's errata sheet impermissibly seeks to alter the substance of his sworn testimony by changing his responses to the

31

questions "Are there any facts on which you're basing your claim that you were terminated because of your gout?", (Klimek Dep., Ex. A to Kindig Cert., at 168:1-4), and "Are you seeking damages for any emotional stress or injury in this case?", (Id. at 179:12-14), from "No" to "Yes." With regards to the Psychotherapy Associates Report, Defendants assert that the report should be stricken because 1) Plaintiff should not be permitted to introduce a report to bolster his claim for emotional damages when Plaintiff abandoned that claim during his deposition; 2) Plaintiff obstructed Defendants' attempts to get discovery as to Plaintiff's emotional distress; and 3) the report fails to comply with Fed. R. Civ. P. 26.

As the Court has granted summary judgment in favor of the Defendants on all counts, it need not reach Defendants' Motion to Strike. Whether or not the Court were to allow Plaintiff to change his deposition answers from "no" to "yes" in response to the two above questions would make no material difference to the Court's above decisions. Plaintiff's mere assertion that he does have facts to support his claim that he was terminated because of his gout would not alter the outcome of Plaintiff's disability discrimination claim because it does not provide the Court with any additional facts to consider, apart from Plaintiff's own belief as to the fact that he has some grounds on which to base his LAD claim. Additionally, it is irrelevant whether or not Plaintiff is seeking damages for emotional distress, as the case as a whole has been dismissed. Thus, it is also irrelevant whether or not to strike the Psychotherapy Associates Report. The Court will therefore deny Defendants' Motion to Strike as moot.

## VII.   **CONCLUSION**

For the reasons above, the Court grants Defendants' Motions for Summary Judgment, and denies Defendants' Motion to Strike as moot.  An appropriate order accompanies this opinion.

**DATED:** June 27, 2014

_____
**CLAIRE C. CECCHI, U.S.D.J.**